**No. 25-11205**

---

**IN THE**
**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

---

ProMED, LLC,
*Plaintiff-Appellant/Cross-Appellee*

v.

Quintairos Prieto Wood & Boyer, P.A.
*Defendant-Appellee/Cross-Appellant*

---

On Appeal from the United States District Court
for the Northern District of Texas, No. 3:23-CV-2023

---

**BRIEF OF APPELLEE/CROSS-APPELLANT**

---

**Thad D. Spalding**
State Bar No. 00791708
tspalding@dpslawgroup.com
**Tammy Holt**
State Bar No. 00796771
tholt@dpslawgroup.com
**DURHAM, PITTARD & SPALDING, LLP**
P.O. Box 224626
Dallas, Texas 75222
(888) 998-6688 - Office
(214) 807-1799 – Facsimile

**Frank Alvarez**
State Bar No. 00796122
frank.alvarez@qpwblaw.com
**Brent W. Martinelli**
State Bar No. 24037037
brent.martinelli@qpwblaw.com
**QUINTAIROS, PRIETO, WOOD & BOYER, PA**
1700 Pacific Avenue, Suite 4545
Dallas, Texas 75201
(214)754-8755 – Office
(214)754-8744 – Facsimile

**COUNSEL FOR APPELLEE/CROSS-APPELLANT**

## CERTIFICATE OF INTERESTED PERSONS

The undersigned counsel of record certifies that the following listed persons and entities as described in the fourth sentence of 5th CIR Rule 28.2.1 have an interest in the outcome of this case. These representations are made in order that the judges of this court may evaluate possible disqualification or recusal.

| | |
|---|---|
| **Appellant/Cross-Appellee:**<br>ProMED, LLC, | **Counsel for Appellant/Cross-Appellee:**<br><br>**Israel R. Silvas**<br>**Christopher D. Kratovil**<br>**Daniel J. Hall**<br>DYKEMA GOSSETT PLLC<br>1717 Main Street, Suite 4200<br>Dallas, Texas 75201<br>(214) 462-6400 – Office<br>(214) 462-6401 – Facsimile |
| **Appellee/Cross-Appellant:**<br>Quintairos Prieto Wood & Boyer, P.A. | **Counsel for Appellee/Cross-Appellant:**<br><br>Frank Alvarez<br>State Bar No. 00796122<br>frank.alvarez@qpwblaw.com<br>Brent W. Martinelli<br>State Bar No. 24037037<br>brent.martinelli@qpwblaw.com<br>QUINTAIROS, PRIETO, WOOD & BOYER, PA<br>1700 Pacific Avenue, Suite 4545<br>Dallas, Texas 75201<br>(214)754-8755 – Office<br>(214)754-8744 – Facsimile |

and

Thad D. Spalding
State Bar No. 00791708
tspalding@dpslawgroup.com
Tammy M. Holt
State Bar No. 00796771
tholt@dpslawgroup.com
DURHAM, PITTARD & SPALDING, LLP
P.O. Box 224626
Dallas, Texas 75222
(888) 998-6688 - Office
(214) 807-1799 – Facsimile

*/s/ Thad D. Spalding*
Attorney of record for
Appellee/Cross-Appellant

## STATEMENT REGARDING ORAL ARGUMENT

Defendant-Appellee/Cross-Appellant believes that oral argument will materially assist the Court in consideration of this appeal.

# TABLE OF CONTENTS

**Page**

Certificate of Interested Persons ........ 2

Statement Regarding Oral Argument ........ 4

Table of Authorities ........ 8

Jurisdictional Statement ........ 11

Statement of the Issues ........ 12

Statement of the Case ........ 13

I. The Escrow Agreement ........ 13

  A. Terms of the Escrow Agreement ........ 14

  B. Disbursement of the escrowed funds. ........ 16

II. ProMed sues QPWB for breach of the Escrow Agreement. ........ 19

III. The Jury Verdict and the District Court's Judgment ........ 20

Summary of the Argument ........ 26

Argument and Authorities ........ 28

I. Standard of Review – de novo ........ 28

II. No reasonable jury could have concluded that the first three disbursements to the manufacturer constituted an act of willful default or a grossly negligent breach of the Escrow Agreement ........ 29

  A. The heightened standard required QPWB to act with knowledge that its actions would likely injure ProMed ........ 29

  B. The evidence showed that Brenner believed he made each of the disbursements in accordance with the terms of the Escrow Agreement ........ 30

1. The district court properly credited the direct evidence that Brenner intended to comply with terms of the Escrow Agreement ........ 31

2. The district court properly credited the direct evidence that Brenner believed that Russo (ProVantage) and Reulet (Luxe) were in constant contact with each other and in agreement regarding the disbursements ........ 33

III. If QPWB did not breach the Escrow Agreement with regard to the first three disbursements, it could not have breached it with regard to the last two disbursements ........ 38

IV. ProMed could not, and did not, prove a breach of the Escrow Agreement without expert testimony ........ 41

A. Expert testimony was required to explain to the jury how the evidence should be applied to evaluate the heightened contractual standard of care ........ 42

1. Expert testimony is required under Alabama law because escrow agents are professionals who must maintain a particular standard of care ........ 43

2. Expert testimony was required under Alabama law because the duty owed by escrow officers is not common knowledge ........ 47

B. The court was not required to reject direct evidence in favor of circumstantial evidence that QPWB treated Luxe unfavorably because QPWB had a fiduciary relationship with ProVantage. But if ProMed wanted the jury to consider the issue of fiduciary duty, it was required to provide expert testimony on that issue ........ 49

V. ProMed is not entitled to attorneys' fees under Alabama law ........ 52

Conclusion....................................................................................................55

Certificate of Compliance ...........................................................................57

Certificate of Service ....................................................................................58

## TABLE OF AUTHORITIES

**Cases** **Page(s)**

*Allen v. USAA Casualty Insurance*
Co., 577 F.Supp.3d 1279, 1284 (N.D. Ala. 2022) ........................................53

*Apache Deepwater, L.L.C. v. W&T Offshore, Inc.*,
930 F.3d 647 (5th Cir. 2019) ........................................28

*Davis v. United States*,
No. 4:19-cv-176-O, 2020 WL 1862560 (N.D. Tex. April 14, 2020) ........................................41

*Dorman v. Jackson*,
623 So.2d 1056 (Ala. 1993) ........................................29

*Ex parte Essary*,
992 So. 2d 5 (Ala. 2007) ........................................30

*Fed. Deposit Ins. Corp. v. Chicago Title Ins. Co.*,
No. 12-cv-05198, 2017 WL 3592736 at*4 (N.D. Ill. Aug. 21, 2017 ........................................47

*Foradori v. Harris*,
523 F.3d 477 (5th Cir. 2008) ........................................28

*Foster v. Foster*,
304 So.3d 211 (Ala. 2020) ........................................53

*Green v. Ingram*,
794 So.2d 1070 (Ala. 2001) ........................................48

*Howard v. Walgreen Co.*,
605 F.3d 1239 (11th Cir.2010) ........................................42

*LeBlanc v. Residence Doctor Home Inspection, LLC*,
SC-2023-0843, 2024 WL 4796676 (Ala. Nov. 15, 2024) ........................................41, 43

*Lewis v. Bd. of Supervisors of Louisiana State Univ. & Agric. & Mech. Coll.*, 134 F.4th 286 (5th Cir. 2025) ........................................28

*MultiPlan, Inc. v. Holland*,
937 F.3d 487 (5th Cir. 2019)....................................................................28

*Oliver v. Ingber*,
No. Civ. A. 96-4471, 1998 WL 107299 (E.D. Pa. Mar. 9, 1998) ...................46

*Presley v. B.L.C. Construction, Inc.*,
64 So.3d 610 (Ala. Civ. App. 2009) *cert. quashed*, 64 So.3d 627
(Ala. 2010)................................................................................................30

*Reynolds v. First Alabama Bank of Montgomery*,
N.A., 471 So. 2d 1238 (Ala. 1985) ...............................................................53

*Riverstone Dev. Co. v. Garnett & Assocs. Appraisals, Inc.*,
195 So.3d 351 (Ala. 2015)..........................................................................44

*Roman v. Sage Title Group, LLC*,
146 A.3d 479 (Md. App. 2016) ..................................................42, 43, 46, 47

*Schaeffer v. Poellnitz*,
154 So. 3d 979 (Ala. 2014)......................................................................30, 34

*Scott v. ABF Freight Services, Inc.*,
306 F. Supp.2d 1169 (N.D. Ala. 2004)..........................................................29

*Tolbert v. Tolbert*,
903 So.2d 103 (Ala. 2004)..........................................................................30

*Tonsmeire v. AmSouth Bank*,
659 So.2d 601 (Ala. 1995)..........................................................................49

*U-Haul Intern., Inc. v. Waldrip*,
380 S.W.3d 118 (Tex. 2012).......................................................................30

*Universal Truckload, Inc. v. Dalton Logistics, Inc.*,
946 F.3d 689 (5th Cir. 2020) .......................................................................42

*Watson, Watson, Rutland/Architects, Inc. v. Montgomery Cnty. Bd. of Educ.*, 559 So. 2d 168 at 173 (Ala. 1990) ............................................*passim*

**Statutes**

ALA. CODE 1975 § 19-1-1, *et. seq.* .......................................................................52

ALA. CODE 1975, § 6–5–580 ...................................................................................48

**Other Authorities**

BLACK'S LAW DICTIONARY (6th Ed. 1990) ..........................................................52

## JURISDICTIONAL STATEMENT

Quintairos Prieto Wood & Boyer, P.A. (QPWB') agrees with ProMed's Jurisdictional Statement, but simply adds that this Court also has jurisdiction to review the district court's denial in part of QPWB's Motion for Judgment as a Matter of Law and Alternatively, Motion for New Trial. (ROA. 815, ROA.996). QPWB timely appealed the court's Order (ROA.966) by filing a Notice of Cross Appeal on October 29, 2025, within fourteen days of ProMed's Notice of Appeal. (ROA.998).

## STATEMENT OF THE ISSUES

1. Did the district court correctly grant QPWB's motion for judgment as a matter of law regarding the first three disbursements where there was no evidence that those disbursements constituted a willful default or a grossly negligent breach of the Escrow Agreement? **(Responsive to Appellant's Issue No. 1)**.

2. If the district courtcorrectly granted QPWB's motion for judgment as a matter of law regarding the first three disbursements, was QPWB also entitled to judgment as a matter of law regarding the last two disbursements, because those disbursements merely paid fees owed to the paymaster and broker upon completion of the other terms of the Escrow Agreement? **(Cross-Issue).**

3. Was QPWB entitled to judgment as a matter of law on ProMed's breach of contract claim regarding any disbursements because ProMed failed to produce expert testimony required by Alabama law to establish both (1) the heightened standard of care set out by the terms of the Escrow Agreement and (2) the standard of care owed by a professional escrow agent? **(Cross-Issue/Responsive to Appellant's Issue No. 1).**

4. Did the district court correctly deny ProMed's motion for attorney's fees where neither the contract nor Alabama law allows the recovery of attorney's fees for breach of contract and ProMed failed to establish that QPWB somehow engaged in "fraud, bad faith, maliciousness, or a clear disregard of court orders"? **(Responsive to Appellant's Issue No. 2).**

# STATEMENT OF THE CASE

## I. The Escrow Agreement.

In 2020, Appellant ProMed entered into a purchase agreement with non-party Luxe Development LLC ("Luxe"), in which Luxe agreed to procure latex gloves to sell in the United States as personal protective equipment ("PPE").[1] (ROA.1144-45; ROA.1148; ROA.1157; ROA.1211-14; ROA.1224). To satisfy its obligation, Luxe entered into a purchase agreement with non-party ProVantage Healthcare Solutions, Inc. ("ProVantage"), who agreed to supply the gloves.[2] Luxe acted as Pro-Med's agent in the transaction, and was represented by Ms. Reulet. Non-party ProVantage, the seller Luxe contracted with, was represented by Ms. Russo. (ROA.1144-45, ROA.1154-56).

[1] After ProMed filed this lawsuit against Luxe and QPWB, Luxe assigned any claims it had against QPWB to ProMed. (ROA.970). Luxe is not a party to this appeal. For the purposes of this appeal, QPWB refers to both ProMed and Luxe as "ProMed" whenever feasible. In certain instances, the events and communications require a reference to "Luxe" instead of "ProMed."

[2] Luxe and ProVantage executed a purchase agreement, which required, among other things, that: (1) Luxe deposit 50% of the gross sale of $950,000 into an Escrow Account with QPWB within 24 hours of signing the purchase agreement; (2) Luxe deposit the other 50% into the Escrow Account with QPWB upon receipt of a Bill of Lading ("BOL") for the gloves; and (3) the escrow officer wire the funds deposited by Luxe in the Escrow Account to the manufacturer. (ROA.1087; ROA.1225; ROA.1247-50; ROA.1283-84).

Luxe and ProVantage "agreed to utilize an escrow officer for the transfer of purchase funds from Luxe to ProVantage as glove shipments were delivered." (ROA.667, ¶10). To accomplish that purpose, ProVantage and Luxe entered into an Escrow Agreement dated July 16, 2020 ("Escrow Agreement"). (ROA.1085). Appellee, QPWB, a law firm, was the escrow officer. As the escrow officer, QPWB was required to transfer funds to the glove manufacturer, TR Construction Import Export, according to the terms outlined in the Escrow Agreement and the instructions received from Luxe and ProVantage. (ROA.667; ROA.1085). As compensation for its role as an escrow officer, QPWB received a small percentage of the escrowed funds—$4,750.00. (ROA.1198; ROA.1357). The Escrow Agreement is governed by and construed in accordance with the laws of the State of Alabama. (ROA.1066, ¶9).

### A. Terms of the Escrow Agreement

The gross sale price for the gloves was $950,000. (ROA.1087). Upon execution of the Escrow Agreement, Luxe was required to deposit 50% of the balance due to ProVantage into a segregated bank account (the "Escrow Account"). *Id.* Luxe was required to deposit the remaining 50% after it received the bill of lading. QPWB's Chief Financial Officer, Alan Brenner,

was the point of contact for QPWB's escrow services. (ROA.1162-63; ROA.1165; ROA.1348-49; ROA.1064; ROA.667 ¶11). Brenner's duty under the Escrow Agreement was to disburse the amounts held in the Escrow Account. (ROA.667, ¶13 ROA.1377-78). Pursuant to the Escrow Agreement, ProVantage was to provide instructions with respect to the timing and destination of every *incoming* and *outgoing* wire to and from the Escrow Account throughout the transaction. (ROA.1364-66).

The Escrow Agreement set out the following instructions for the disbursement of escrow funds:

> Upon [QPWB]'s receipt of consistent written instructions from both [ProVantage] and [Luxe], [QPWB] will disburse the Escrowed Funds in accordance with such instructions. . . . Notwithstanding the foregoing provisions . . . , in the event that [ProVantage] or [Luxe] provides [QPWB] and the other party with a written certification claiming the Escrowed Funds pursuant to certain provisions of the Purchase Agreement, [QPWB], in its absolute and sole discretion, may elect to proceed by:
>
> (i) notifying [Luxe and ProVantage] that it intends to disburse the Escrowed Funds in accordance with such request unless the non-requesting party delivers a written objection to such requested disbursement within twelve (12) hours after receipt of said notice, and
>
> (ii) so disbursing the Escrowed Funds to the requesting party after such 12-hour period, provided the non-requesting party has not objected to such disbursement[.]

(ROA.967; ROA.1064, ¶5). The basis of ProMed's breach of contract claim is that QPWB breached the Escrow Agreement by failing to follow these instructions. (ROA.23;ROA.1217). At trial, Brenner testified that all of the funds were disbursed pursuant to, and in compliance with, the Escrow Agreement. (ROA.1349; ROA.1202-03).

The Escrow Agreement also included specific provisions addressing the liability of the escrow agent, QPWB:

> [QPWB] will be entitled to rely upon the instructions and other matters covered thereby, and will not be required to investigate the authority of the person executing and delivering such instructions, or otherwise verify the accuracy of the statements or information presented therein.
>
> [QPWB] is not liable "for any losses, costs or damages it may incur in performing its responsibilities hereunder unless such losses, costs or damages arise out of the willful default or gross negligence of [QPWB] or its agents.

(ROA.1064, ¶¶ 5, 6; ROA.1202-1203).

**B. Disbursement of the escrowed funds.**

Luxe deposited the initial $475,000.00 into the Escrow Account on July 28, 2020. (ROA.667 at¶3). A few days later, Mr. Brenner received instructions from Ms. Russo (ProVantage's agent) to wire $95,000.00 to the manufacturer,

T.R. Construction Import Export. (ROA.667 at ¶4; ROA.1351-52). Mr. Brenner followed those instructions.

After receiving a Bill of Lading stating the gloves had been shipped from the manufacturer, Luxe deposited the second $475,000.00 into the Escrow Account on August 19, 2020. (ROA.667 at ¶5; ROA.1261; ROA.1262; ROA.1265; ROA.1303; ROA.1353; ROA.1354; ROA.1097). A second disbursement of $348,750 was made to the manufacturer that same day. (ROA.667 at ¶6). A third disbursement was made to TR Construction on August 31, 2020. (ROA.667 at ¶7). The disbursements to TR Construction on July 31, 2020, August 19, 2020, and August 31, 2020 totaled $887,500 and are referred to herein as the "first three disbursements."

On February 26, 2021, QPWB disbursed $4,750 to itself for the agreed-upon paymaster fee. (ROA.226-29, 278, ROA.290-92, ROA.1083, ROA.1184-85, ROA.1198-1202, ROA.1276, ROA.1356-57, ROA.1372). On April 7, 2021, QPWB disbursed the remaining balance in the Escrow Account, $57,750, to Advanced Healthcare Solutions as a broker fee. (ROA.225). The disbursements made on February 26, 2021 and April 7, 2021 to QPWB and Advanced Healthcare Solutions totaled $62,500 and are referred to herein as the "last two disbursements."

The following chart summarizes the relevant dates and disbursements

| Date | | |
|---|---|---|
| 7/18/20 | $475,000.00 | **Deposit from Luxe** |
| 7/31/20 | $95,000.00 | Wire Transfer to TR Construction |
| 8/19/20 | $475,000.00 | **Deposit from Luxe** |
| 8/19/20 | $348,750.00 | Wire Transfer to TR Construction |
| 8/31/20 | $443,750.00 | Wire Transfer to TR Construction |
| 11/10/20 | | Email from Rucker to Brenner that ProVantage is in breach of the purchase agreement |
| 2/26/21 | $4,750.00 | Paymaster Fee to QPWB |
| 4/7/21 | $57,750.00 | Broker Fee to ProVantage Healthcare |
| **Total Disbursements** | **$950,000.00** | |

There is no dispute that all of the funds deposited by Luxe were transferred by Brenner to either TR Construction for the purchase of the gloves, or to QPWB and Advanced Healthcare Solutions for broker and paymaster fees. (ROA.630, ¶¶3-9). There is no dispute that QPWB was not notified that there was any problem with the receipt of the gloves until months after QPWB had disbursed the purchase money to the manufacturer. (ROA.978-81).

According to its terms, Paragraph 5 required that Brenner either (1) receive consistent instructions from both parties regarding a disbursement, or give the other party (in this case, Luxe) notification 12 hours after the receipt of the instructions from ProVantage, the party initiating the request.

(ROA.1064). It is undisputed that Brenner made the first three disbursements based solely on instructions of ProVantage/Russo, without receiving independent confirmation from Luxe. ProMed argued this was a breach of the Escrow Agreement.

Brenner, however, also explained at trial that, based on the course of conduct between the parties, he believed the instructions he received from Russo were, in fact, a reflection of the wishes of both ProVantage and Luxe. (ROA.978-981; ROA.1336-39; ROA.1359-60; ROA.1361-66; ROA.1374). Brenner believed, therefore, that he was making disbursements in compliance with the Escrow Agreement, without the necessity of receiving additional instructions from Luxe, or notifying Luxe 12 hours after receiving the instructions from Russo. *Id*.

**II. ProMed sues QPWB for breach of the Escrow Agreement.**

Unbeknownst to QPWB, the gloves which were the subject of the ProMed Contract and Purchase Agreement were never delivered by Luxe to ProMed. (ROA.1297). ProMed's corporate representative agreed that QPWB was never a guarantor for delivery of the gloves, and QPWB played no role in the fact that the gloves were not delivered to ProMed. (ROA.1218-29; ROA.1320-24). In fact, ProMed agreed, had the manufacturer delivered the

gloves to Luxe, ProMed would not have complained about QPWB disbursing any of the funds to the manufacturer. (ROA.1227-29; Doc. 60 at 14; ROA.1293-95).

ProMed initially sued Luxe and Luxe's owner, Ms. Reulet, for the failure to provide the gloves pursuant to the Purchase Agreement between Luxe and ProMed. (ROA.1219-22; ROA.1158; ROA.1315). When ProMed discovered that neither Luxe nor its owner, Reulet, had any assets, ProMed took an assignment of Luxe's claims, and filed suit against QPWB for the very claims that it admits Luxe would not have had against QPWB if the gloves had been delivered. (ROA.1068; ROA.1158; ROA.1217-26; ROA.1231; ROA.1232).

## III. The Jury Verdict and the District Court's Judgment

At trial, the parties agreed that Paragraph 6 of the Escrow Agreement imposed liability on QPWB only if Brenner's actions constituted a "willful default" or if he acted with "gross negligence". (ROA.640-41). Those terms were defined for the jury as follows:

(1) "'Willful default' means a conscious or intentional failure to act, as opposed to an accidental or involuntary noncompliance. No wrongful motive or intent is necessary to show willful conduct."

> (2) "'Gross negligence' means that the intentional failure to perform a manifested duty in reckless disregard of the consequences as affecting the life and property of another."

*Id.*

At the close of ProMed's case, QPWB made an oral motion for judgment as a matter of law, alleging that ProMed had failed to offer sufficient evidence on which the jury could base a finding that QPWB acted in willful default or with gross negligence. (ROA.188-89). The trial court denied the motion. (ROA.189).

The jury ultimately found that QPWB breached the Escrow Agreement with respect to all five disbursements, and awarded ProMed $900,000 in damages from QPWB. (ROA.635). The district court entered a judgment consistent with this verdict. (ROA.651).

Following entry of the judgment, QPWB renewed its motion for judgment as a matter of law, arguing that there was no evidence that Brenner acted in willful default or with gross negligence when he made any of the disbursements. (ROA.815). Even if Brenner technically breached the agreement by failing to notify Luxe before the funds were transferred, QPWB argued, Brenner never acted in willful default or with gross

negligence because he made the disbursements pursuant to instructions received from Ms. Russo, instructions he believed reflected joint communications between ProVantage and Luxe. (ROA.1334-39, 1359-66, 1377). QPWB also argued that Brenner justifiably relied on the parties' representations and communications that indicated that they were in not only in constant communication, but also that Luxe approved of the instructions that Russo was providing to Brenner. (ROA.978-981,1336-39; ROA.1359-66, 1374).

The district court agreed that there was no evidence that the first three disbursements violated the heightened standard for breach of the Escrow Agreement. (ROA.975-981). The court held that when Mr. Brenner made the first three disbursements, "he believed he was in compliance with the Escrow Agreement and, that he "believed that Russo and Reulet [at Luxe] had discussed each of the T-R Transfers and [Brenner] assumed that Russo and Reulet were in constant contact regarding the disbursements."[3] (ROA.978-981; ROA.1338).

[3] QPWB also offered expert testimony that it is customary in escrow transactions like this one to receive instructions from only one party. The court refused to allow the jury to hear that expert opinion testimony, because the court held that expert testimony was unnecessary. The court was wrong, and QPWB raises this point of error in its Cross-Appeal.

The district court concluded that Brenner made the first three disbursements to TR Construction, totaling $887,500, pursuant to the instructions provided by ProVantage's agent, Russo (who Brenner believed was also acting on behalf of Luxe's agent, Reulet), and prior to receiving any notification that there might be a problem getting the gloves. (ROA.667 at ¶¶6, 7; ROA.1335; ROA.1335-36; ROA.1356; ROA.1358-59). The district court concluded that, even if Brenner had technically violated the terms of the Escrow Agreement by failing to notify Luxe of the disbursements, "the jury could not have reasonably found that QPWB willfully defaulted on the Escrow Agreement or that QPWB's breach of the Escrow Agreement resulted from gross negligence." (ROA.976-77; ROA.980-81).

However, the district court also concluded that the jury could have found that QPWB violated the heightened standard when Brenner made the final two disbursements because, at that point, QPWB was on notice Luxe did not authorize the disbursements. (ROA.981-82).

To support that conclusion, the court first cited evidence that, although Luxe apparently realized "soon" after receiving the Bill of Lading that it, along with other documents from the manufacturer, were allegedly "fictitious," Luxe failed to inform QPWB about this issue until "sometime

around November" 2020. (ROA.823, ROA.1292-9.95). The court noted that on November 10, 2020 and January 11, 2021, Brenner received emails from ProMed and Luxe that "the terms of the Escrow Agreement had not been followed…and requested that QPWB cease any attempts to transfer funds related to the transaction" and that "Luxe did not agree to the release of any funds." (ROA.979-80). The court found that the jury could have relied on Luxe's November 10, 2020 email to find that disbursements after that date were undertaken in willful default or with gross negligence. (ROA.981-85).

In its motion for judgment as a matter of law, QPWB argued that QPWB could not have breached the Escrow Agreement when Brenner made those last two disbursements, because Brenner did not need any instructions from either Luxe or ProMed to legitimately make the disbursements. The last two disbursements simply represented fees owed to QPWB and Advantage Healthcare—after all the purchase money for the gloves had been disbursed. Because those conditions had been fulfilled by the first three disbursements to TR Construction, QPWB was simply following the provisions of the Escrow Agreement by paying the fees owed. In fact, Brenner testified that he did not even consider the final $62,500 to be "Luxe's money" and he could not have willfully defaulted on the Escrow Agreement

by disbursing that money regardless of whether he received instructions from Luxe. (ROA.1198).

The district court entered a new judgment against QPWB and in favor of ProMed, but this time only for $62,500, which represented the amount of the final two disbursements to the broker and the paymaster, and awarded ProMed its costs of court. (ROA.993). The district court denied ProMed's request that it be awarded any attorney's fees. (ROA.986-991).

## SUMMARY OF THE ARGUMENT

There is no dispute that QPWB had nothing to do with the fact that neither Luxe nor ProMed received the gloves that Luxe paid for. There is also no allegation that QPWB did anything with the money it held in escrow besides disbursing the purchase money to the manufacturer, and then paying fees owed once those disbursements were complete. And even if any of the disbursements could be considered a technical breach of the Escrow Agreement, that agreement imposes liability on QPWB *only* for acts of willful default or gross negligence. There was insufficient evidence for the jury to have found that QPWB willfully defaulted or was grossly negligent in making any of the five disbursements.

The district court properly granted QPWB's motion for judgment as a matter of law, at least in part, because there was no evidence that the first three disbursements of purchase money to the manufacturer constituted a willful default or a grossly negligent breach of the Escrow Agreement. The district court, however, should have granted QPWB's motion with regard to all five disbursements since the last two disbursements were disbursements required by the Escrow Agreement simply to pay fees owed once all of the purchase money had been disbursed. QPWB was not required to wait on

instructions from either Luxe or ProVantage to make the two disbursements—QPWB was only required to fulfill the terms of the Escrow Agreement by disbursing all of the purchase money to the glove manufacturer, and there is no dispute that it did just that. QPWB therefore did not breach the Escrow Agreement, much less breach it willfully, by making the last two disbursements of fees after the first three disbursements were properly made to the manufacturer.

In short, the undisputed evidence is that QPWB made each of the five disbursements with the good faith belief that it was complying with the terms of the Escrow Agreement. Said another way, there was simply no evidence that *these* actions constituted a breach of *this* Escrow Agreement. This Court should affirm in part and reverse in part, rendering judgment that ProMed take nothing on its claims.

## ARGUMENT AND AUTHORITIES

### I. Standard of Review—de novo.

The court reviews a grant or denial of a motion for judgment as a matter of law de novo, applying the same standard as the district court. *Lewis v. Bd. of Supervisors of Louisiana State Univ. & Agric. & Mech. Coll.*, 134 F.4th 286, 291–92 (5th Cir. 2025); *MultiPlan, Inc. v. Holland*, 937 F.3d 487, 494 (5th Cir. 2019). That review is "especially deferential" to the jury's verdict, requiring the court to draw all reasonable inferences and resolve all credibility determinations in the light most favorable to the nonmoving party. *Lewis,* 134 F.4th at 291-92 (citing *Apache Deepwater, L.L.C. v. W&T Offshore, Inc.*, 930 F.3d 647, 652–53 (5th Cir. 2019)).

Nonetheless, judgment as a matter of law is proper "if the evidence points so strongly and so overwhelmingly in favor of the [ ]moving party that no reasonable jury could return a contrary verdict." *Id.* (citing *Foradori v. Harris*, 523 F.3d 477, 485 (5th Cir. 2008)); *MultiPlan*, 937 F.3d at 494. By that same token, in order to prevail on its cross-appeal, QPWB must show that "no reasonable jury would have had a legally sufficient evidentiary basis"

for finding that QPWB acted willfully or with gross negligence. *Lewis, 134 F.4th at 292* (citing *Apache Deepwater*, 930 F.3d at 653.

## II. No reasonable jury could have concluded that the first three disbursements to the manufacturer constituted an act of willful default or a grossly negligent breach of the Escrow Agreement.

The district court properly granted QPWB's judgment as a matter of law because no reasonable jury could have found that any breach of the Escrow Agreement for which QPWB could be liable. Even if QPWB failed to exactly follow the provisions of the Escrow Agreement, the Escrow Agreement explicitly provides that the escrow agent is only liable for acts of willful default or gross negligence and there is no evidence to support such a conclusion.

### A. The heightened standard required QPWB to act with knowledge that its actions would likely injure ProMed.

Under Alabama law, "[s]imple negligence is the inadvertent omission of duty; and wanton or willful misconduct is characterized as such by the state of mind with which the act or omission is done or omitted." *Scott v. ABF Freight Services, Inc.*, 306 F. Supp.2d 1169, 1176 (N.D. Ala. 2004) (quoting *Dorman v. Jackson,* 623 So.2d 1056, 1058 (Ala. 1993) (citations omitted)). Furthermore, in breach of contract cases, Alabama courts have explained that "[i]mplicit in wanton, willful, or reckless misconduct is an acting, with

knowledge of danger, or with consciousness, that the doing or not doing of some act will likely result in injury." *Presley v. B.L.C. Construction, Inc.*, 64 So.3d 610, 624 (Ala. Civ. App. 2009), *cert. quashed,* 64 So.3d 627 (Ala. 2010) (quoting *Ex parte Essary,* 992 So. 2d 5, 9–10 (Ala. 2007), quoting in turn, *Tolbert v. Tolbert,* 903 So.2d 103, 114–15 (Ala. 2004) (further quotations omitted) (emphasis omitted)). Thus, to prove that QPWB acted willfully, ProMed was required to show not only that QPWB breached the contract, but that QPWB did so with the conscious knowledge that sending the purchase money funds to the manufacturer would "likely result in injury" to ProMed. *Id*.

Similarly, under Alabama law, gross negligence requires that ProMed prove QPWB intentionally failed "to perform a manifested duty in reckless disregard of the consequences as affecting the life and property of another." *Schaeffer v. Poellnitz*, 154 So. 3d 979, 986 (Ala. 2014)(citing *U-Haul Intern., Inc. v. Waldrip*, 380 S.W.3d 118, 137 (Tex. 2012)). ProMed failed to prove that Brenner was aware that sending the funds to the manufacturer when he did constituted a reckless disregard of the consequences affecting ProMed.

### B. The evidence showed that Brenner believed he made each of the disbursements in accordance with the terms of the Escrow Agreement.

With respect to the first three disbursements to the manufacturer, the district court properly found that no reasonable jury could have found that Brenner acted with the requisite intent to establish either willfulness or gross negligence. (ROA.977-81). Brenner's unrefuted testimony established that, at all times, he believed his actions were authorized and in compliance with Luxe's wishes and the terms of the Escrow Agreement. There was no evidence which could have supported even an inference that Brenner consciously knew, acted, or failed to act with the conscious knowledge that the very actions he believed Luxe wanted him to take would likely result in injury to Luxe or ProMed.

#### 1. The district court properly credited the direct evidence that Brenner intended to comply with terms of the Escrow Agreement.

Contrary to ProMed's claim that the jury could have drawn "multiple inferences related to the interpretation of" the Escrow Agreement, (Doc. 42 at 26) Brenner's duty under the Escrow Agreement is clear. Brenner was simply required to send the funds to the manufacturer after receiving instructions to do so. (ROA.1377). It is undisputed that he did just that.

The district court properly rejected ProMed's argument, relying on paragraph 4 of the Escrow Agreement, that QPWB committed a willful breach of the Escrow Agreement because: (1) QPWB did not wait for consistent instructions from Luxe; or (2) QPWB failed to provide Luxe with notice and wait to receive authorization from Luxe prior to disbursing the funds. (ROA.1146; ROA.1393-94; ROA.1149; ROA.1395-96). To be clear, all of the purchase money for the gloves went to the manufacturer, and neither Luxe nor ProMed ever alleged that QPWB misappropriated any of the funds for itself.

Importantly, paragraph 5 of the Escrow Agreement provides that the "[e]scrow agent will be entitled to rely upon the instructions and other matters covered thereby and will not be required to investigate the authority of the person executing and delivering such instructions, or otherwise verify the accuracy of the statements or information presented therein." (ROA.1064, ¶5; ROA.1202-03). Based on paragraph 5, Brenner testified that when he received Ms. Russo's instructions on July 31, 2020, to disburse the first half of the funds, he reasonably believed that she was expressing the wishes of both Luxe and ProVantage, and that he was therefore in

compliance with the Escrow Agreement when he followed Russo's instructions. (ROA.1349; ROA.1202-03).

**2. The district court properly credited the direct evidence that Brenner believed that Russo (ProVantage) and Reulet (Luxe) were in constant contact with each other and in agreement regarding the disbursements.**

Contrary to ProMed's claim, the court did not simply "give complete credence" to Brenner's belief in contradiction to some "body of evidence presented to the jury" that the disbursements were unauthorized. (Doc. 42 at 26). The jury was presented with (unrefuted) testimony from Brenner that he believed he was complying with the Escrow Agreement because he understood that Reulet and Russo "were in constant contact about this transaction." (ROA.1334-35). And the jury was also presented with emails which affirmed that Russo and Reulet *were, in fact* frequently communicating about the funding of the transaction, coupled with evidence that Reulet (Luxe) actually did the things which Russo (ProVantage) told Brenner that Luxe would be doing. (ROA.1336-39). As Brenner testified:

Q: And it says here: Did Ms. Russo alert QPWB that that the wire was coming in from Luxe?
A: Yes.
Q: Did the wire come in, or was it sent?
A: It came in.

***

Q. Last question says: Did you believe Ms. Russo and Ms. Reulet had discussed?

A. Yes.

Q. And why is that?

A. Because the - - Charlene Russo alerted me that the money would be coming in and indeed came in, so she obviously talked to Michelle Reulet. Michelle Reulet from Luxe sent the money to our trust account.

(ROA.1359-60) (discussing the July 28, 2020 deposit). Indeed, when Luxe first deposited the funds into the escrow account, it was *Russo* who notified Brenner that the wire was incoming from Luxe—*not Reulet*—even though Reulet (Luxe) would have necessarily been the one to initiate the wire. (*Id.*; *see also* (ROA.1362) (discussing the August 19, 2020 deposit)).

Then, Brenner testified repeatedly that he was wiring the funds out "in line with Escrow Agreement [paragraph] Number 5" and that when he did so, he believed that Russo and Reulet had discussed the transfer prior to his initiation of the wire. (ROA.1359-66). According to Brenner, all the money he wired out went exactly where it was supposed to go, and he relied on Russo to know the timing and destination of every wire. (ROA.1366).

Brenner testified that he believed that Reulet was in constant communication with Russo, and had regular phone conferences with Russo,

as well as phone calls with Russo and the manufacturer. (ROA.1366). Brenner testified:

> Every step of the way, as we just reviewed, I was relying on Charlene Russo's direction. She provided wire transfer instructions, routing numbers, account numbers, payee names --payee name, it all went to the same place, and that she had been discussing the transaction with her customer, Michelle Reulet of Luxe.

(ROA.1365). There is no reasonable inference to be drawn from that direct evidence besides the conclusion that Brenner believed that when he received instructions from Russo (ProVantage), those instructions were in accordance with Reulet (Luxe's) wishes as well.[4]

This unrefuted testimony negates a finding that Brenner consciously and intentionally failed to act in reckless disregard of the consequences as affecting the property of another. In fact, had Brenner acted as ProMed contends he should have—i.e., ignore the wiring instructions given to him by Russo—he would have willfully breached his obligations under the Escrow Agreement.

---

[4] If ProMed had offered the necessary testimony, the expert could have confirmed the testimony from Brenner that it is typical in escrow transactions for the escrow agent to receive instructions from only one party.

ProMed also tries to convince this Court that objections Luxe made to the disbursements **months after the fact** should be considered sufficient evidence to support the jury's verdict that Brenner willfully breached the agreement **when the disbursements were actually made**. (Doc. 42 at 22-23). But the district court correctly focused instead on the evidence that Luxe failed, at any time prior to, or even immediately after, the money was disbursed on its behalf, to dispute or otherwise oppose the disbursements. The evidence shows that on **July 22, 2020**, Brenner received an introductory email from Luxe's attorney, Rucker, prior to the *first deposit* (not disbursement) into the escrow account, and that Brenner spoke with Rucker at that time with no concerns. (ROA.1177; ROA.1075). Indeed, Brenner did not receive any other emails from Rucker until **November 10, 2020**[5]—months after the last disputed disbursement had been sent in **August of 2020.**[6] And that was long after Luxe knew, "soon" after receiving the August

---

[5] An email dated October 7, 2020, between Rucker and ProVantage was submitted into evidence concerning the disputes between Luxe and ProVantage. (ROA.1077). It appears to show that Russo from ProVantage forwarded this email to Brenner—but is no evidence that ProMed alerted Brenner or QPWB as to any problems at that time. *Id.*

[6] *See* (ROA.1082). The first disbursement of $95,000 was made on **July 31, 2020 (three days after the introductory email)**; the second disbursement of $348,750 was made on **August 19, 2020**; and the third disbursement of $443,750 was made on **August 31, 2020**. (ROA.1178-79; ROA.1180-82).

25, 2020 Bill of Lading, that the bill of lading was purportedly "fictitious." (ROA.1293-94). The district court properly credited the evidence that Rucker made no objections to disbursing the funds prior to the wires being sent during July and August of 2020.

In short, the district court was correct to grant QPWB's motion based on the timeline established by the direct evidence: that by the time Rucker sent *any* emails expressing concerns with how QPWB was handling the escrow funds, the primary disbursements—the three sent directly to the manufacturer of the gloves—had long been completed. The district court correctly held that, contrary to ProMed's arguments, the after-the-fact emails from Rucker asking Brenner to stop releasing funds from the escrow account were no evidence that Brenner had any knowledge of any danger associated with wiring the funds as directed months earlier. (ROA.979: Doc. 67 at 140).

In conclusion, the direct evidence actually established an absolute *lack* of willful default or gross negligence. As Brenner testified, all the money was sent exactly where it was supposed to go, per the instructions he was provided, and he believed, in compliance with the Escrow Agreement. (ROA.1364-66). There was neither direct nor circumstantial evidence to support the jury's finding that Brenner consciously believed that wiring the

funds to the manufacturer involved an extreme degree of risk to Luxe, or that Brenner was conscious that doing so would likely result in injury to Luxe.

## III. If QPWB did not breach the Escrow Agreement with regard to the first three disbursements, it could not have breached it with regard to the last two disbursements.

By November 10, 2020, the only remaining funds in the account were the paymaster's and broker's fees of $4,750 and $57,750, respectively, which were disbursed on February 26 and April 7, 2021. (ROA.1197-98; ROA.1192). The district court concluded there was sufficient evidence to support the jury's finding that QPWB breached the Escrow Agreement with regard to just these disbursements because, when Brenner informed Luxe that it was time to disburse those fees, Luxe instructed Brenner that, because ProVantage had breached its agreement with Luxe, Brenner should not make any further disbursements "related to this transaction." (ROA.1082-83).

With respect to the heightened standard for liability, the evidence showed that Brenner's motivation for the last two payments was the same as it had been for all the previous payments—to comply with the requirements of the Escrow Agreement. Brenner was not required to get

independent approval from the parties just to disburse the paymaster and broker fees as authorized, and required, by the Escrow Agreement itself.

In fact, it wasn't even until **Brenner emailed Luxe** November 10, 2020 to express his "understanding that the transaction between the parties had concluded and there are no further obligations beyond the disbursement of [QPWB's] paymaster fee and the agreed funds as disclosed in the [Purchase Agreement] for [Advantage] Healthcare Solutions" that Luxe responded and informed Brenner that ProVantage was "in breach of their agreement with Luxe." (ROA.1083). Even if Luxe's response could have put Brenner on notice that ProVantage's breach meant that no more of Luxe's funds should be disbursed to ProVantage pursuant to the Escrow Agreement, Brenner's payment of fees were not transfers to the manufacturer or to ProVantage; they were simply the payment of fees to QPWB and Advanced Healthcare Solutions[7] for managing the escrow process.

The only other evidence of Brenner's motivation for advising Luxe and then making the final two disbursements (after receiving the November 10, 2020 regarding ProVantage's breach) is that QPWB wanted to be finished

[7] Advanced Healthcare Solutions was not even a party to the Escrow Agreement. (ROA.1185).

with the transaction (9 months after the arrangement was supposed to have concluded). The last two disbursements were simply the final acts required by the Escrow Agreement. (ROA.1194).

Brenner even testified that the final two payments of fees were paid out of the "profit that was left over" for ProVantage after the purchase price was sent to the manufacturer. (ROA.1198). Far from willfully mismanaging Luxe's money in violation of the Escrow Agreement, Brenner testified that he did not even consider the remaining sum to be Luxe's money (ROA.1198). By cross-appeal, QPWB contends that the court erred when it found that there was sufficient evidence to support the jury's finding that QPWB willfully breached the Escrow Agreement by making the final two disbursements of paymaster and broker fees (under the same conditions as the first three non-breaching disbursements).

In other words, just like the first three transfers, Brenner made the final two disbursements solely in order to comply with the terms of the Escrow Agreement, not to breach it. *See* (ROA.1184-87, ROA.1189-1202; ROA.1200-01) ("These funds have been held in escrow for quite some time. I hope your client ended up receiving the gloves, but the disbursement of escrow funds

from the paymaster's fee and the brokers are not contingent on the successful eventual shipment of gloves.”).

The district court properly found that Brenner could not have willfully breached the Escrow Agreement with the first three disbursements, because Brenner “believed he was in compliance with the Escrow Agreement.” (ROA.977). But it erred when it reached the opposite conclusion with respect to the last two transfers. This Court should therefore reverse that part of the district court’s order denying QPWB’s motion for judgment as a matter of law and render judgment that ProMed take nothing on its breach of contract claim.

## IV. ProMed could not, and did not, prove a breach of the Escrow Agreement without expert testimony.

Alabama law requires expert testimony when a party has alleged that a professional has breached the applicable standard of care. *See, e.g., LeBlanc v. Residence Doctor Home Inspection, LLC*, SC-2023-0843, 2024 WL 4796676, at *3 (Ala. Nov. 15, 2024). In addition, the Fifth Circuit requires expert testimony when the standard of care, such as willful default or gross negligence in an escrow transaction, is “of such a nature as not to be within the experience of the layman.” *Davis v. United States*, No. 4:19-cv-176-O, 2020

WL 1862560, at *4 (N.D. Tex. April 14, 2020). ProMed did not present *any* expert testimony at trial. Without expert testimony, it was impossible for ProMed to satisfy its burden of proof. For this additional reason, QPWB was entitled to judgment a matter of law on ProMed's breach of contract claim.[8]

### A. Expert testimony was required to explain to the jury how the evidence should be applied to evaluate the heightened contractual standard of care.

The district court concluded that expert testimony was not required because the conditions for breach were set out in the Escrow Agreement itself. (ROA.974). In fact, the court even rejected QPWB's reliance on *Roman v. Sage Title Group, LLC*, 146 A.3d 479 (Md. App. 2016), because according to the court, that case "involved a claim for *negligence*. ProMed is suing for

---

[8] QWPB preserved this complaint in the district court by specifically complaining that ProMed failed to meet its burden of proof by not presenting any expert testimony explaining either the duties of escrow agents or the heightened standard of care required under the Escrow Agreement. "Strict identity of issues ... is not required..." in a Rule 50a motion, as long as the issues argued and those spelled out in the motion "are closely related, such that opposing counsel and the trial court may be deemed to have notice of the deficiencies asserted by the moving party." *Howard v. Walgreen Co.,* 605 F.3d 1239, 1243 (11th Cir.2010) (quotations and citations omitted). QPWB's complaint about the lack of a type evidence, such as expert testimony, is subsumed within its "sufficiency of the evidence" argument that was raised generally in the Rule 50a motion. *See, e.g., Universal Truckload, Inc. v. Dalton Logistics, Inc.,* 946 F.3d 689 (5th Cir. 2020). ProMed's failure to present expert testimony for the standard of care and heightened standard of care for escrow agents in these circumstances is not only "closely related" to the grounds argued by QPWB in its Rule 50a motions, it is actually subsumed by and incorporated in those grounds.

*breach of contract*." (ROA.975). In distinguishing the *Roman* case, the court made the same mistake that it appears the jury made. Under the express terms of the Escrow Agreement, the only way the jury could find a breach of contract is if it found QPWB acted willfully or was grossly negligence. Hence, the only standard of care which is relevant is the standard applied in negligence cases, not breach of contract cases. To evaluate that standard properly, expert testimony was required.

**1. Expert testimony is required under Alabama law because escrow agents are professionals who must maintain a particular standard of care.**

Under Alabama law, expert testimony is required when "a party has alleged that a professional has breached the applicable standard of care." *LeBlanc v. Residence Doctor Home Inspection, LLC,* SC-2023-0843, 2024 WL 4796676, at *3 (Ala. Nov. 15, 2024) (requiring expert testimony to establish the applicable standard of care and the breach of that standard in order for plaintiff/purchasers to prevail on summary judgment against inspection company); *see also Riverstone Dev. Co. v. Garnett & Assocs. Appraisals, Inc.*, 195 So.3d 351, 255 (Ala. 2015) (affirming a trial court's judgment as a matter of law in favor of the defendants because plaintiffs had not produced an expert witness to establish that the defendants had violated the standard of care

applicable to real estate appraisers). Just like real estate appraisers and home inspection companies, escrow officers are members of a profession that requires specialized knowledge, qualifying them as professionals.

The Supreme Court of Alabama has applied this doctrine to breach of contract cases just like this one and upheld directed verdicts where—as here—the plaintiff failed to present *any* expert testimony during trial. *See, e.g., Watson, Watson, Rutland/Architects, Inc. v. Montgomery Cnty. Bd. of Educ.*, 559 So. 2d 168 at 173 (Ala. 1990). Indeed, *Watson* is strikingly similar to this case: it involved a judgment entered against a defendant architect on a breach of contract claim,[9] which the jury decided in favor of the plaintiff school board, arising out of property damages incurred when the roof of a junior high school leaked. *Id*. at 170. On appeal, the architect argued that his conduct was not a breach under the terms of that particular agreement, because "exculpatory language" in the agreement "absolve[ed] the Architect

[9] The school board also asserted an alternative negligence claim. 559 So.2d at 175 ("The School Board stated at oral argument that its negligence claim was asserted as an alternate theory of recovery in case its contract claim was not allowed). After the trial, the court directed a verdict in favor of the Architect on the negligence claim on limitations grounds. *Id.* The Alabama Supreme Court affirmed this ruling. *Id.*

from liability to the School Board because all roof leaks involved were attributable to the faulty workmanship of the contractor." *Id.* at 171.[10]

In reviewing the contract and the evidence at trial, the Alabama Supreme Court pointed out that "the only evidence concerning the Architect's duty under the agreement was from an architect" under whose "interpretation of the contract the Architect was not under a duty to inspect for the specific defect that was alleged in this case." *Id.* at 173. However, because an architect is a "professional," the Court stated that "expert testimony was needed in order to show whether the defects here should have been obvious to the Architect during the weekly inspections." *Id.*

Likewise, escrow officers and law firms are professionals. Thus, "[j]ust as in cases dealing with an alleged breach of a duty by an attorney, a doctor, *or any other professional*, unless the breach is so obvious that any reasonable person would see it, then expert testimony is necessary in order to establish

---

[10] QPWB has consistently maintained that, among other reasons, it did not breach the Escrow Agreement because any failure to deliver the gloves was attributable to the manufacturer, not QPWB. Just like the architect in *Watson*—who contended that "imposition of liability upon it here would be nothing short of a holding that the Architect was a guarantor of the contractor's work"—in this case, imposition of liability against QPWB would be akin to holding that QPWB, the escrow officer, was the guarantor of delivery of the goods—a position that even ProMed's own corporate representative agreed the Escrow Agreement does not require. 559 So.2d at 171; *see also* (ROA.1228; ROA.1410; ROA.1416).

the alleged breach." *Id*. at 173-74 (emphasis added). Here, as in *Watson,* any purported breach of the Escrow Agreement was not "so obvious that any reasonable person would see it." That is especially true not only in light of the Escrow Agreement's heightened standard of willful default or gross negligence, but also in the face of an experienced escrow agent's testimony that his actions were customary and in compliance with the agreement. *Id*.

Finally, even though Alabama courts may not have addressed the specific circumstance of expert testimony with respect to an escrow agent, other courts consistently conclude that expert testimony is required to establish the applicable standard of care for escrow officers. *See, e.g., Oliver v. Ingber*, No. Civ. A. 96-4471, 1998 WL 107299, at *3 (E.D. Pa. Mar. 9, 1998) (expert testimony was required to establish the standard of care owed by defendant attorneys to non-client plaintiffs pursuant to an escrow agreement because "[t]he factual issues" relating to what standard was owed "were not simple and straightforward"); *Fed. Deposit Ins. Corp. v. Chicago Title Ins. Co.*, No. 12-cv-05198, 2017 WL 3592736 at*4 (N.D. Ill. Aug. 21, 2017)("Testimony about the intricacies of the escrow industry and the obligations and customs of escrow officers is beyond the scope of 'an untrained layman,' and instead constitutes specialized knowledge within the scope of Rule 702."); *Roman v.*

*Sage Title Group, LLC*, 229 Md. App. 601, 623, 146 A.3d 479, 492 (2016)("expert testimony was required to establish [agent's] negligence, because *most lay people are not familiar with the operation of escrow accounts."* (emphasis added)).

**2. Expert testimony was required under Alabama law because the duty owed by escrow officers is not common knowledge.**

The court erroneously upheld the jury's finding of breach even in the absence of expert testimony because it concluded that that the jury "did not need to understand the operation of escrow accounts or the standard of care a title company owes to individuals or entities who are not customers, but who deposit funds in escrow with the title company." (ROA.975) (citing *Roman,* 146 A.3d at 495). However, the Alabama Supreme Court has already held that the "nature and extent of the duty" of an escrow officer who agrees to hold certain funds in escrow and then disburse them to other parties "are not matters of common knowledge." *Watson*, 559 So.2d at 174.

Brenner—who had worked at QPWB for over 24 years—testified *repeatedly* that he was wiring the funds out "in line with Escrow Agreement [Paragraph] Number 5." (ROA.1361; ROA.1359-60; ROA.1362; ROA.1363; ROA.1364-66;). In addition, Brenner testified that in prior real estate deals where his law firm had received funds into a trust account and disbursed

those funds, **one attorney** "usually provides a check request or a wire instruction request." (ROA.1347). These instructions would come typically from only "**one side of the transaction**," just like they did here. Far from willfully defaulting on the Escrow Agreement, Brenner was confident there was nothing that violated any duty or the contract by similarly acting on the instructions of only one party in this transaction. *Id;* (ROA.1349).

Furthermore, the trial court improperly held that no expert testimony was required even though QPWB was a law firm acting as the escrow officer. (ROA.973 at note 4). It is well-established that in Alabama, expert testimony is required for claims brought against attorneys. *See, e.g., Green v. Ingram*, 794 So.2d 1070 (Ala. 2001) ( "Expert testimony is required in order to establish deviation from a standard of care in connection with [an] alleged breach [of an attorney's standard of care]. ALA. CODE 1975, § 6–5–580.") (quoting *Tonsmeire v. AmSouth Bank,* 659 So.2d 601, 605 (Ala. 1995) (case properly dismissed because plaintiff failed to produce expert testimony that attorney deviated from the accepted standards for attorneys providing services in the handling of trusts in the same or similar circumstances)).

When the district court granted the judgment as a matter of law, it was able to distinguish between a technical breach of the Escrow Agreement,

versus a breach which imposed liability because it rose to the level of willfulness or gross negligence. It was error to enter a judgment based on the jury's finding of breach when ProMed failed to present the jury with the expert testimony necessary to help the jury make that same distinction. Without that testimony, no reasonable juror could have found that ***this*** conduct was a breach of ***this*** Escrow Agreement. The court erred when it affirmed the jury's finding that the Escrow Agreement had been breached, in the absence of necessary expert testimony.

**B. The court was not required to reject direct evidence in favor of circumstantial evidence that QPWB treated Luxe unfavorably because QPWB had a fiduciary relationship with ProVantage. But if ProMed wanted the jury to consider the issue of fiduciary duty, it was required to provide expert testimony on that issue.**

In its attempt to contradict all of the direct evidence from Brenner regarding the reason he made each disbursement, ProMed argued that there was circumstantial evidence that QPWB treated Luxe unfavorably because it had a fiduciary relationship with ProVantage that it did not have with Luxe. According to ProMed, the court should have drawn an inference based on that circumstantial evidence, and rejected all of the direct evidence that Brenner gave explaining why he did not think he was required to get

additional confirmation from Luxe before disbursing the funds to the manufacturer. (Doc. 42 at 17-23). The court properly credited the direct evidence over inferences which could allegedly be raised from ProMed's "circumstantial evidence" of disparate treatment.

First, the Escrow Agreement expressly provided that QPWB did not owe either Luxe or ProVantage a fiduciary duty. (ROA.1065; ROA.1167-68). Next, Brenner explained that the sole basis for a fiduciary relationship between QPWB and ProVantage was an engagement letter the parties entered. Brenner further testified that QPWB only entered into the engagement agreement, or letter of representation, with ProVantage so that QPWB would have access to the bank account necessary to "receive funds and then transfer funds out to effectuate this purchase of nitrolic gloves." (ROA.1332). That is a purpose which was equally advantageous to both parties.

The district court was not required to reject direct evidence that the existence of a fiduciary relationship did not cause disparate treatment between Luxe and ProVantage in favor of drawing an inference that QPWB played favorites when Brenner followed instructions that were delivered by ProVantage. That is especially true when Brenner testified he believed the

instructions he received represented the combined wishes of both parties.

Finally, even if there was some credible evidence that the fiduciary relationship between QPWB and ProVantage was relevant to whether Brenner breached the Escrow Agreement, ProMed failed to provide the jury with the necessary expert testimony to explain what the duties of a fiduciary are. In the absence of *any* expert testimony regarding the standard of care in this case for escrow officers, attorneys, or fiduciaries, ProMed failed to provide the jury with sufficient evidence to support a verdict that QPWB breached the contract in a willful or grossly negligent manner. Instead, and notwithstanding the fact that ProMed didn't even assert a claim for breach of fiduciary duty, ProMed raised that issue simply to inject confusion, and inflame the jury into reaching a verdict based on sympathy for ProMed.

It was harmful error to allow that evidence because ProMed failed to present the jury with any expert testimony to explain what a fiduciary is or what duty he owes. When Brenner (who is not an attorney) was asked at trial to define his understanding of the legally nuanced term "fiduciary," even Brenner struggled, defining a fiduciary as someone "who will act in accordance with the wishes of the parties." (ROA.1332-33). Indeed, even in the legal profession, the words "fiduciary" and "fiduciary duty" are defined

nine different ways spanning two pages in Black's Law Dictionary. BLACK'S LAW DICTIONARY at 625-26 (6th Ed. 1990).

Finally, Alabama is a state that has adopted the Uniform Fiduciaries Act, which addresses the duties and liabilities of fiduciaries when dealing with certain negotiable instruments and assets, and which clarifies the rights and responsibilities of those acting as fiduciaries. ALA. CODE 1975 § 19-1-1, *et. seq*. These are complex concepts. The court erred by allowing ProMed's counsel to inject the concept of fiduciary duty without providing *any* expert testimony to aid the jury in deciphering the scope of the alleged improper fiduciary relationship. In such cases, the Alabama Supreme Court, has "point[ed] out the value, and in some cases, the *necessity*, for expert testimony to aid the court and the trier of fact in resolving conflicts that might arise." *Watson*, 559 So.2d at 174 (emphasis added). In this case, expert testimony on fiduciary duties was a necessity once ProMed injected that concept into the trial.

## V. ProMed is not entitled to attorneys' fees under Alabama law.

The district court properly held that ProMed is not entitled to attorneys' fees under Alabama law. On appeal, ProMed seeks attorney's fees under the Alabama doctrine of "special equity." Doc. 42 at 30. However,

the district court properly recognized that "Alabama's special-equity exception is somewhat narrow in its scope and application," *Allen v. USAA Casualty Insurance* Co., 577 F.Supp.3d 1279, 1284 (N.D. Ala. 2022) (citing cases). The doctrine purportedly allows a court to exercise its discretion to award fees "when a defendant has committed fraud willful negligence, or malice or otherwise has acted in bad faith." *Foster v. Foster*, 304 So.3d 211, 221 (Ala. 2020) (citing *Reynolds v. First Alabama Bank of Montgomery*, N.A., 471 So. 2d 1238 (Ala. 1985)).

The trial court properly rejected ProMed's argument that, because the Escrow Agreement uses some of those same words when it imposes liability for willful default or gross negligence, then a breach of the Escrow Agreement satisfies the standard set out in Alabama jurisprudence. (ROA.989). Using the same words does not mean that the Escrow Agreement and Alabama caselaw are satisfied by the same conduct. Rather, the court properly concluded that "in practice, [Alabama courts] have not awarded attorney's fees under the 'special equity' exception absent a showing of fraud, bad faith, maliciousness, or a clear disregard of court orders." (ROA.989) (citing cases).

First, the court correctly held that there was insufficient evidence for the jury to find that the first three disbursements were made willfully or with gross negligence. But even if the trial court got that wrong, there is still no evidence that the actions of QPWB which constituted a breach of contract also satisfied the standard of "fraud, bad faith, maliciousness or clear disregard of court orders" which would be required for the court to even consider exercising its discretion to award fees. As the district court properly pointed out, an award of attorneys' fees would have "required conduct, either before or during the litigation, that is more egregious than what occurred in this case." (ROA.988) (citing cases).

Next, even if the district court correctly held that the last two disbursements were in breach of the Escrow Agreement, there was likewise no evidence of bad faith with respect to those particular disbursements. The final two disbursements were for the payment only of the paymaster and broker fees which came due once all of the escrow funds were disbursed. Regardless of whether Brenner was justified in disbursing the funds to the manufacturer (and the evidence shows that he was) there is no question that he had any bad motive when he simply followed the terms of the Escrow Agreement to pay broker and paymaster fees.

## CONCLUSION

The trial court properly entered judgment as a matter of law that QPWB did not breach the Escrow Agreement with respect to the first three disbursements to the manufacturer. The trial court erred when it found sufficient evidence to support the jury's verdict that QPWB breached the Escrow Agreement by making the final two disbursements of broker and paymaster fees, and for awarding any attorney's fees for those breaches. The Court should reverse in part and render a Final Judgment that ProMed take nothing on its claims.

Respectfully submitted,

By: */s/ Thad D. Spalding*

Frank Alvarez
State Bar No. 00796122
frank.alvarez@qpwblaw.com
Brent W. Martinelli
State Bar No. 24037037
brent.martinelli@qpwblaw.com
QUINTAIROS, PRIETO, WOOD & BOYER, PA
1700 Pacific Avenue, Suite 4545
Dallas, Texas 75201
(214)754-8755 – Office
(214)754-8744 – Facsimile

And

Thad D. Spalding
State Bar No. 00791708
tspalding@dpslawgroup.com
Tammy M. Holt
State Bar No. 00796771
tholt@dpslawgroup.com
DURHAM, PITTARD & SPALDING, LLP
P.O. Box 224626
Dallas, Texas 75222
(888) 998-6688- Office
(214) 807-1799 – Facsimile
***Attorneys for Defendant-Appellee/Cross-Appellant***

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the word limit of FED. R. APP. P. 27(d)(2)(A) because, excluding the parts of the document exempted by FED. R. APP. P. 32(f),

**X** this brief contains **9112** words, or

__ this brief uses a monospaced typeface and contains ____________ lines of text.

2. This brief complies with the typeface requirements of FED. R. APP. P. 32(a)(5) and the type-style requirements of FED. R. APP. P. 32(a)(6) because:

**X** this brief has been prepared in a proportionally spaced typeface using **Microsoft® Word for Microsoft 365 MSO (16.0.14026.20202) 64-bit** in **14-point**, **Book Antiqua font**, or

__ this brief has been prepared in a monospaced typeface using [state name and version of word processing program] with [state number of characters per inch and name of type style].

*/s/ Thad D. Spalding*
Thad D. Spalding
***Attorney for Defendant/Cross-Appellees***

Date: **June 10, 2026**

## CERTIFICATE OF SERVICE

I hereby certify that on **June 10, 2026**, I electronically filed the foregoing document with the Clerk of the Court for the Fifth Circuit, using the electronic case filing ("ECF") system of the Court. All counsel of record were served via electronic service through the ECF system.

Israel Silvas, Isilvas@dykema.com
Christopher D. Kratovil,
ckratovil@dykema.com
Cliff Riley, criley@dykema.com
DYKEMA GOSSETT PLLC
1717 Main Street, Suite 4200
Dallas, Texas 75201
***Attorneys for Plaintiff-Appellant***

*/s/ Thad D. Spalding*
**Thad D. Spalding**